Your Honor, the second case on the docket is Ward 2-19-0278, Perkins Building, Kansas. It appears that the maker of this plaintiff's appellant is the Advanced Vocal Services, Ireland, for the purpose of defending its affiliates. I hereby declare that the plaintiff's appellant is the Advanced Vocal Services,  I hereby declare that the plaintiff's appellant is the Advanced Vocal Services, Ireland, for the purpose of defending its affiliates. Whether the nuisance alleged in this case was permanent or temporary. Secondly, the trial court erred in finding that the Mormon doctrine unquestionably applied to this case. And three, the defendants were improperly permitted to argue that the plaintiffs came to the nuisance, which we believe is a substantial likelihood that the jury's verdict would have been different had they not heard this prejudicial argument in evidence. And obviously, justices in our briefs, we argue that additional evidentiary errors occurred, but they all kind of flowed from these primary errors such that that's what I'm going to focus on in this argument. First, the trial court erred in determining as a matter of law that the nuisance involved in this case was temporary as opposed to permanent. As your honors are aware, the hallmark of a temporary nuisance is that it's occasional, intermittent, or recurrent. It must be remediable, removable, or abatable. And then it sets forth a policy and procedure where plaintiffs can bring successive suits over periods of time to seek damages for those specific sets of time. Permanent nuisances, rather, the law has set forth a policy where plaintiffs may bring one suit to compensate them for all damages resulting from the existence of that nuisance. The nuisance is generally deemed to be continuing indefinitely. It's usually the result of a permanent structure that had a legal right to be there. And the key factor in determining whether a nuisance is permanent or temporary is the intention to continue use or operation of the facility. Now, in this case, we believe that there was sufficient evidence. Can you determine that if the continuation of that use is dependent on licensing or permitting from state or local agencies? Well, I think that that's exactly why I demonstrated that there was, at a minimum, a question of fact. Because in this case, there was evidence that the license had expired once before and then was renewed. The landfill was at capacity at least twice before and then subsequently expanded. And moreover, there was testimony from the landfill's representative that they had every intention of continuing to operate, quote, unquote, indefinitely. That they planned another expansion and that they had to actually apply for further permits. So we think that, at a minimum, creates a question of fact. The jury should have been able to hear that evidence and determine as to the landfill's intention to continue operating. Is that with respect to the adjacent land? Yes. So, for example, in this case, when one set of plaintiffs here, the Andrews, first purchased their property, they were over a mile away from the landfill. They were surrounded by other homes and an apple orchard. The landfill then twice expanded to the point where they were directly across a two-lane street. So I just don't believe that the trial court was correct. Is there a limitation as to the height of the mound? In other words, most fills, garbage dumps, were the layman's terminology. In DuPage County, it was called Mount Trashmore for many years. It ultimately stopped because it reached maybe 60, 80, 100 feet off the ground or above grade. Is there a limit to the height that the mound across the street could get before they had to cease dropping or pushing garbage there? I'm not aware of the specific height requirement, but I do know that there is significant testimony that the barriers that were erected to prevent the trash from blowing over across the street into the plaintiff's property weren't significant and that the trash continued to blow over and into the plaintiff's specific property. So I can't speak to the exact height requirements, and I can certainly take some time and look that up if Your Honor would like me to submit a supplemental brief. Well, doesn't the fact that they intended to expand yet a third time, if I have my chronology correct here, would indicate that possibly what your client was complaining about was temporary because the expansion would remediate the problem? I don't believe the expansion would remediate the problem because the testimony in this case was specific that it wasn't just limited to trash blowing over onto the property. It was also directly related to the noxious odors, the venting of the gases, the birds that would be carrying the trash directly from the dump onto the plaintiff's property. There was an infestation of turkey vultures and gulls that began roosting as a result of the proximity to the trash mounds. And then there was obviously dead varmints and bird droppings that were all over the plaintiff's property as a result because the birds would go directly across the street. So the continued expansion would not have abated the nuisance at all. And I think the Seventh Circuit, when they were applying a preliminary law in the Trident v. Amico case, that was the issue where the petroleum was contaminating the land. And at that point, the Seventh Circuit agreed that whether it was temporary or permanent, that's really a question for the jury to decide. And the jury should hear all evidence relating to those damages and decide what measure is appropriate and decide whether the nuisance is in fact temporary or permanent. In this case, because the court determined as a matter of law that the nuisance was deemed to be temporary, the court prohibited the plaintiffs from presenting any evidence about the diminution in their property values. And really, that ruling impacted all of the subsequent rulings in this case as far as the motions and limiting the jury instructions. The inference to be drawn from your argument seems to be that had additional damages have been allowed to have been presented to the jury, the jury would more likely have granted judgment in your favor, which it did not do. Did it not grant judgment in favor of the defendant? It did grant judgment in favor of the defendant. And if it granted judgment in favor of the defendant, wouldn't that have mooted the question of damages? Because if there's no liability, there are no damages. And therefore, this ruling relating to the nature and extent of damages is no longer material. Certainly, however, Justice, the problem with that ruling, as I mentioned, it impacted all of the other motions and limiting it as well as the arguments that were permitted to be made to the jury. So, for example, because the court determined that it was a temporary nuisance as a matter of law, that not only affected the type of damages arguments that could be presented, but it also impacted the types of evidence that the jury heard in relation to blameless conduct. And, for example, the defendants were allowed to argue that this was, the court has already determined that this is a trifling temporary nuisance. It will be gone. It will be abated. I believe it was a closing argument, and I have the record citation. The defendant's counsel argued that this was similar to building a house next to an L train, and you came to the nuisance, and so, therefore, what did you expect? The defendant's closing argument also argued that this amount of dust and debris was temporary, as the court already ruled. So, therefore, this was similar to having a house be built next to you. You're going to experience dust for a little bit, and then it's fine. So I think that because those arguments were made and because that type of evidence was presented, that so skewed the jury's view and interpretation of this case that it, a substantial likelihood exists that the jury's verdict would have been different had it been permitted to hear all of the evidence and had the defendant not been permitted to make those improper arguments, such as coming to the nuisance, which, as Your Honors know, under the common law, that is absolutely not a defense. The only exception is for farms, and that's something we laid out in our brief very, very clearly, because I think that is so prejudicial to make that argument to a jury that, okay, what do you expect when you build your house next to a landfill? They came to the nuisance. Why should they get anything here? I think that was critical in swaying the jury. So I do believe that it wasn't just the issue of damages. It was also the evidence that the jury heard. I'm sorry. Go ahead. You claim that it was error for the trial court to not allow the log complaint book or the complaint log book from being admitted into evidence. I believe the defendant's claim that it was irrelevant because it didn't relate to your property, and I think your retort or your initial argument for admitting those complaints was at least insofar as the expert who testified on behalf of the defendant supposedly testified about places other than the plaintiff's property, so why can't we as well? And when he testified, was he testifying as to hearsay? The defendant's expert? Yes. The defendant's expert was permitted to testify about, I think it was called a centometer. Well, he was testifying about things he did. Yes. And he witnessed. Yes. Measurements that he observed. Yes. The complaint log book, wouldn't that be, even though it may be a business record, wouldn't it be hearsay to the extent that the complaint that was logged would be hearsay in the classic sense that it would be submitted for the truth or veracity of the claim? I could certainly see where that objection would be raised. I don't believe it would. I believe it would fall under the hearsay exception. Did you ever contact people in the log book and either request or subpoena them to be present to testify about what they observed on a given date that related to the complaint that was in the log book? Well, Your Honor, I'm certain that we would have wanted to, but the trial court had already ruled that not only could those individuals not testify about what they observed at other locations, but the plaintiffs in this case, they could not even testify about any smells or sights or observations or experiences they had at any location other than their exact home. So what did the defendant present the testimony of the expert relative to sentiments in places other than the property in question? In this case, Your Honor, the defendant's expert presented all of its sentiment or evidence at locations that were not on the plaintiff's home. So essentially, the defendant was allowed to present expert testimony saying, on the corner of X and Y, the sentiment reading said zero. On the corner of A and B, the sentiment reading said zero. But there was never any testimony about what sentiment reading was taken from plaintiff's actual property. So the defendant was allowed to argue that there was no odors from all of these other locations throughout the neighborhood, but then the plaintiffs were only allowed to testify that they experienced odors on their property and were prohibited from testifying about any odors that they experienced while visiting their neighbors or while walking down the street or while going across the street to get something, while driving through the neighborhood. They were barred from testifying about any of that, their own personal experiences, which, again, I believe is a prejudicial error such that the jury's verdict could have been different had they been permitted to hear that evidence. Essentially, you know, what's good for the goose is good for the gander. There's no reason that the defendant's expert should have been permitted to give that kind of testimony about all of these other areas, whereas the plaintiffs were not. But the fact remains the jury did hear that on the plaintiff's property they experienced these issues, and this was their case, not their neighbor's down the street. I mean, there were two here. That's correct. So not only did the jury hear the scintometer information about the corner of 5th and Main, they particularly heard about what was going on on the plaintiff's property, correct? They did. That is absolutely correct. However, the defendant was then able to use the scintometer readings from his expert to essentially, you know, impugn the plaintiff's credibility, saying, well, you've got one person here saying I experienced bad smells on my property, but we've got these 50 other scintometer readings all throughout the neighborhood that say no smells whatsoever. Were you precluded from retaining an expert in scents and taking measurements with the same or similar equipment on your client's property? No, I don't believe there was any order precluding the plaintiffs from doing that. Was it done? I don't think it was, was it? I don't believe so, Your Honor. But again, my problem goes back to the rules, the evidentiary rulings should have been the same. So when there was no objection to talking about the complaint log from all of these other individuals saying I've experienced these smells in these other areas, that at least should have been permitted to, at a minimum, rebut what the defendant's expert was testifying about. And how would you be prejudiced by this? I think it would have called into question the credibility of the defendant's expert and the magic nose scintometer readings to permit the jury to see this vast log of complaints from many, many different individuals who reside in this community saying, no, I'm experiencing these noxious odors, it's horrible, I'm calling a complaint, as opposed to the scientist saying my machine doesn't pick up any odor. Additionally, Your Honor, I know that the Mormon doctrine always seems to raise more questions than it answers, at least in my experience, but it is kind of a fascinating doctrine and that's why I think we need to discuss it. Because the trial court found that because the nuisance in this case was a temporary nuisance as a matter of law, it then looked to Henry Chicago flood and found that the Mormon doctrine applied. It appears I am out of time. So if you have any questions about the Mormon doctrine, I'd love to get into that. One last question. If the interrogatories, be they 10, 20, 30, or 50, are appropriate because of the complexity of the case, if it is error, why is it error to have allowed those to go to the jury? Well, I think as we set forth in our brief, Your Honor, 32 special interrogatories was inappropriate in this case because they were interdependent and the case law in Illinois is very clear that a properly formed special interrogatory must be case dispositive and not interdependent or correlated to other special interrogatories. We argue that they are repetitive, misleading, and they use several undefined terms, which is illustrated in the fact that the jury sent back multiple questions asking for definitions of terms that were used in those special interrogatories, such as what is reasonable, can we have a different definition of negligence. There are, I believe, two other terms in the special interrogatories that the jury did not understand. The jury then came back saying we are completely deadlocked. We don't know what to do. Can we see the complaint log? And the judge said no. So we think that is further indication that these interrogatories were inappropriate, they were confusing, and they should not have been given in this case. That's a point of minutia. Am I correct in my belief that no interrogatory impeached the verdict? That is correct. And that they were all basically consistent with each other? Yes, they were. Well, I was going to say I thought there were three questions that the jury asked during deliberation. And you're right. Can we see the complaint log? What's the difference of negligence or reasonable? And we can't reach a verdict. How does that relate to your primary argument that they were confused? They had questions. That doesn't mean they're confused, does it? I think that in reading through the record and reading through the jury instructions that were given and the 32 special interrogatories that were given, using terms that are perhaps not as common to a lay juror. But they were consistent with the instructions, the terms were, weren't they? They were consistent with the instructions, but as we argued in our brief, those instructions were improper as well, simply because the trial court did not give certain instructions that we argued should have been given. Thank you. You'll have an opportunity to make rebuttal. Mr. Sheehan, you may proceed. I'd like to start the questioning and ask if the complaints were relating to malevolent odors, was it relevant? Why was it relevant for your expert to testify about errant odors in places other than on the property in question? Good morning, Your Honor. Terrence Sheehan on behalf of the defendant, Ellie. Our expert was a rebuttal expert. His name was Suresh Rawani, and he was allowed to testify to rebut the testimony that was given by their expert, Dr. Williams. Dr. Williams testified, and we have this on page 17 of our brief, that as part of his opinion that the gas odor system was not operating properly and therefore negligently being operated, he testified that in order to get to that conclusion, he considered the impact on the community and other residents and the complaints that the community and other residents had made. Now, the judge had determined early that this is a property case, that the plaintiff was able to get up and testify how their use and enjoyment was affected by this alleged nuisance. They were allowed to call whomever they wanted. They could have called family members. They could have called residents. They could have called friends who could have testified about how the plaintiffs were impacted on the property. This was not a public nuisance case. This isn't writ large, all of the odors going throughout the entire community. Once Mr. Williams got up there and said that he considered complaints by the entire community and how odor was migrating off the property as a whole, they opened up the door to rebuttal testimony from our expert who said, I went out there using a scintometer, which is the only device that is allowed under the Illinois EPA to measure these types of odors, and said, that's just not true. The odor, the systems are functioning properly. So this was a direct rebuttal. They objected to it, and we'll concede that. But Judge Ortiz was very measured in what he did. He said, I'm going to allow this for a limited purpose because of what Mr. Williams said, but I'm still not allowing testimony on all the other issues. And, in fact, as we put in our brief, we wanted to get into additional information. What we were hoping to get into evidence was the Lake County Health Department's, their own determinations and reports. Because what they have to do each week is to go out and they do inspections, not only of the property, but they do inspections throughout the community. And they log and they make determinations as to the level of odor. Judge Ortiz blocked us from doing that because he said, that's not relevant. We're not going to get into that. This case is about the effect on this property, the effect on the plaintiff's property, and I'm not going to allow that. So the only reason that he allowed Mr. Relevani's testimony was to directly rebut what Mr. Williams had testified in their case in chief. But Mr. Williams was really a, or Dr. Williams was a, was more of an engineering expert talking about how things were not properly working, correct? Correct. And as a result of that, he was doing this analysis and then he said, as a result of this, these other things could be happening in the community. He didn't say they were. He said they could be. Yes, that is absolutely true, Your Honor. But he did say, in order to get to that, I consider all of this evidence. And then what we said, well, hold on, Your Honor. Now they have talked about that. You said that we're not supposed to get into that. He testified about all of this evidence. We think that we should be able to rebut that testimony. And that was, and again, we cited the court's finding. He said, I'm going to allow it in for that limited purpose. And by the way, as we also said, this was just one data point in an entire case that we think the facts are overwhelmingly in our favor. They only called one expert. And Justice McClaren said, did they get their own expert? Of course they did. They could have used a centometer and gone to their home, and they could have said, here it is. It's above the age threshold. This is prima facie evidence that they are violating the older nuisance statute. They didn't do that. What they did is they just relied on the testimony of the plaintiffs as to how it affected their use and enjoyment, and they didn't prove their case. They had one expert who testified about the negligence. We had three experts. We had the dean of the engineering school at the University of Virginia and Dr. Benson who testified that he completely disagreed with Dr. Williams. The jury had a right to, it was a battle of the experts, and quite frankly the verdict states that we won that battle. We also had an engineer, Mr. Lewis, who runs the facility, and he described all of the things that he was implementing, all the processes that they were implementing, to run as a reasonably careful landfill operator. Did any of your experts say there was no odor that emanated from that landfill? Not at all, Your Honor. In fact, Mr. Williams got up and said, we understand that as a landfill you're going to have some migration of odor. That's just part of what happens with a landfill. The issue is, is it substantial? Is the invasion substantial? Or under either a nuisance theory, negligence theory, or a trespass theory, you have to prove either intentional conduct or negligent conduct. That is why we had experts that say we are operating this facility not only at the standard of care but exceeded the standard of care. We had another expert, Clark Lundell, who's been a geotechnical engineer for 30 years and has worked on over 200 landfills. He got up there and testified that all of the processes that we have employed were at the standard of care or exceeded. And then on top of it, Your Honor, in order to operate a landfill, it's a creature of state and federal law. In order to get a permit and then to perform under that permit, we had to take various steps, one of which is to put a cover on every night. Another is to put 40,000 gallons of water each day to make sure that dust doesn't migrate. And that's why the Lake County Health Department is empowered to inspect and to put out notices of violations. We haven't had any of those. This landfill has been operated at the top of its game in this industry. Every week a garbage truck comes past my house on Friday, and while they're there, it's not pleasant. They make noise and it smells. But when they move down to my neighbor's house, it's not a problem because they're downhill. How could this be considered temporary when it's going on day after day after day? Your Honor, the issue of temporary and permanent nuisance is, you know, there's two types of nuisance. I don't know why. I just need to back out to answer the question. Because Chicago flooded, we really didn't get into that, and we shouldn't because that's an issue of damages and they really would have to prove that we need to get a new trial before we can get to the issue of damages. But a permanent nuisance is something that will continue indefinitely, first prong. And the second prong is the structure of constituting the nuisance as a lawful one or which the person or entity has a legal right to maintain. And those work in concert with each other. But your expert said that there are odors and other things that migrate from any landfill including that are unpleasant, right? That's true, Your Honor. And so if that landfill is going to stay there and you had evidence that it was operating under a valid license and there were permits to expand, how can that be temporary? Okay. I would like to correct one thing. There aren't permits to expand, and that's a critical thing. But, you know, of course, a landfill, there will be odors just like it. You know, there will be a noise next to Wrigley Field or there might be smells next to Lake Michigan. Depending on where you are, there are structures and things that happen. Yeah, but once again, there are only so many baseball games that can be at Wrigley Field, so it would be for a season, not for the whole year. The lake has pretty bad smells when the alewives come forward, but that only happens maybe twice a year. And, you know what, Your Honor, that's why they were able to present their case and they have to prove that it's substantial. And they didn't prove it. Now, there may be smells, and it's not all the time. We've cited in our briefs that the defendant said that thousands of times they were able to go outside and enjoy their property, take walks on their property, have family parties where there wasn't any smell. So this isn't a constant smell, Your Honor. I want to make sure that that's clear. It's intermittent, and it's usually maybe when it's hot out or on certain days. If it rains, they might not be doing it in the winter. In fact, Ms. Napier said she never once smelled any odor during the entire winter. That's half the year. But to answer your question, Your Honor, about the issue of permanency, Judge Ortiz properly found the three things. One, the landfill is a creature of state and federal law. Two, it cannot be cited, permitted, built, or operated without multiple levels of approval. And three, when the permit capacity is reached, it has to cease operations. Because of that, it necessarily cannot be indefinite, and it doesn't satisfy the other prong, which is that they have a legal right to maintain it. When is the capacity met? Well, we don't know because it's – there is a set capacity. Isn't that the very definition of permanency? Oh, no, no. Oh, pardon me, Your Honor. We do know. We know that there's a certain amount. And getting back to Justice McClaren's question. But that's amount. The question was when. That's the time answer. Six to eight years from 2017. So we believe, you know, it could be as soon as three years from now. Could be. Could be.  And no later – well, their own expert said, Your Honor, that based on the amount of capacity, he did a calculation, that he said it will cease between six and eight years. And – If there's no expansion. If there's no expansion. But we don't have the expansion. So at least the 68-year deal right now – Six to eight years? No, because – I mean, there's no evidence that you're not going to expand, correct? Well, we can't – correct, Your Honor, we can't prove what will happen in the future. But what we can prove is that it's available. In order to get that expansion, it has to be cited. The city of Zion has to have public hearings. And these plaintiffs or anyone could come in and they could potentially stop it. So imagine this. Imagine that they say, This is a permanent nuisance that's going to go on indefinitely. I should get damages for the rest of my life. And say, This permanently changes the character of our neighborhood and my property values are down by $100,000. And then a year from now, when the city of Zion is saying, Should we expand this? No, you can't do that. If they got hundreds of thousands of dollars because of this permanent nuisance, this landfill closes, it then could be repurposed as a golf course or as a trail. And who knows what it could do for the property values. The legal remedy is, as opposing counsel said, successive temporary – you bring successive nuisance claims. So they filed one now between 2011 and 2018. The jury found that there was no nuisance. If they believe that we're operating it unlawfully or negligently, they file another one. If we don't get the permit, it's done. It ceases. So under these facts, there cannot be a permanent nuisance. And they still have a legal right to address or to redress any problems. All right, but it doesn't become – if it closes, and you said possibly three years it'll reach capacity, they don't just wave a wand and it becomes a lovely lake for the community or a golf course, as you said. That takes time. So that's additional time that the landfill owners are responsible for, correct? Correct. And so is it permanent as – you know, is it a permanent nuisance as to them, the landfill, that they must maintain, or is it permanent for the life of these people in this house? Well, Your Honor, the fact that it's an open face – and this was all the testimony in the trial and at summary judgment. When a landfill gets to capacity, they put an impermeable seal over it. And then it's almost like, you know, it's – I'm sure we've all seen them when you drive down the expressways. Then they put, you know, something on top of it. That's how it would look and that's how it would end up. But it's still – I've seen them, I've been near them. They don't become flower gardens. Well, Your Honor, some do. I wouldn't say a flower garden, but some – I can tell you there's several golf courses that are former. I know, but that takes some time. Sure, that does. So just the cover does not accomplish, you know, a flower garden there. There are still smells that emanate from the ground. They don't cover every single piece of ground. They don't cover underneath their fence. I agree, Your Honor. And that's where some of the smells come from. But it won't be an active landfill. The reason why the smells emanate at this point is because they are literally accepting garbage. And then they're trying to mitigate that. But once that stops, they're no longer accepting garbage, and then it's a completely different analysis. And I remind the Court that none of this, whether it's permanent or temporary, prevents the plaintiff from putting in evidence that it's an actual nuisance. This is just damages. Whether it's permanent or temporary really goes to whether or not they get a level of damage that's different from what they could get in a temporary nuisance. They had an opportunity to show, over the seven years, that this activity that was occurring was, in fact, a nuisance, and they were unable to do that. And none of the errors, or none of the alleged errors, were such that they were reversible. So this is really an academic exercise. It looks like my time is up. If you have any questions, I'm more than happy to answer them. Otherwise, any other questions? What's your response to Ms. Hamilton's statement that the partial summary judgment, is what I think it should be called, affected the nature and extent of the evidence that was presented, which she believed should have been allowed insofar as the, I believe the way she characterized it was since it was deemed only to be temporary, the trial court did not allow evidence which would have gone in had it been deemed to have been permanent, or at least have the jury determine whether or not it would have been permanent. Do you remember what she said? Yes, I do, Your Honor. I can refer you to what she said in her brief, and I believe I remember what she said here. In her brief, she said it would have changed the statement of the case. The statement of the case is not evidence. It might be the most innocuous thing that happens in a jury trial when the judge introduces the jury to what the claims are going to be. So she said it would have changed the statement of the case. Again, not evidence at all. The second was it affected a couple of the motions that Lynn made. That is true. Anytime you have, as you said, partial summary judgment, summary determination, it's going to affect the proofs at trial. But the evidence was damages evidence. And the motions that Lynn made, she's referring to are the motions that Lynn made relating to the opinions of their expert about the appraisal of the home. If that is not, if the value of the home is not going to be an issue, then, of course, there's no reason to have motions that Lynn made about those opinions. So those were the motions that Lynn made. And then the third was expert testimony about property value. Again, none of this would come in unless they can prove the underlying elements of the tort, which they failed to do. And then I believe she also said something about coming to the nuisance. I'm not sure what it was, but it was something about the closing argument. I gave the closing argument. And they didn't object once at the closing argument. So if they had an error at the closing argument, they were required to lodge an objection and then file something in a post-trial brief that says how they're prejudiced, which they failed to do. It was not in the post-trial brief or post-trial motion either? Objections to your closing argument? No. Oh, you know, I take that back, Your Honor. They did say that I, they objected in the post-trial brief that I said something about a lottery, and then they didn't raise that here. I guess the issue is that the only, they didn't make any objections at closing argument related to coming to the nuisance or to the issue of, I think she said, I said trifling or a trifling issue. None of that was objected to. None of it was preserved. Is coming, now I do have a question, is coming to the nuisance used in this capacity or is it used in agricultural capacity? They've argued that we are attempting to use the Illinois Farm Act. We're not. That's a statute that has nothing to do with this case. Coming to the nuisance is a theory that, or I should say, they're misrepresenting what we say coming to the nuisance is. Well, did you explain that to the jury? You said what coming to the nuisance was? No, no. Actually, Judge, we asked Judge Ortiz to give an instruction on coming to the nuisance that was what we believed helpful to us. He denied that. What they're arguing about is the statement that I made at the end, and what I said was, which is consistent with Toftoy v. Rosenweigel. But that was a farm. No, no, no. You're right. That case was a farm. I know that. The two of us know that. Yeah, we do. Well, then I'm sure you're, I'm certain that you then are familiar with the. . . That was a dairy farm and horses. Exactly. The Supreme Court, though, said in that case you're dealing with the statute because that's different from common law. The statute says if the farm was there first, it's actually, you know, it could be a complete defense. We never made that argument. I didn't make that at the closing. Well, then what did you mean by coming to the nuisance? No, no. What I said was it's a factor that you could consider. It's a factor that who was there first is a factor, and that's what the Supreme Court said. And, in fact, it's backed up by the restatement. The restatement of torts, Section 84D says, although it is not conclusive in itself, meaning it's not an absolute defense, the fact that the plaintiff has come to the nuisance is still a factor of importance to be considered in cases where other factors are involved. So that's just the question. This landfill was there since 1976. But was it, in fact, a mile away from the plaintiff's home when they moved in? That's true when they made it very clear, and that was what the jury was able to determine, is whether or not what type of factor or how much weight that should be given. But absolutely under Illinois law, Your Honor, in that case, the Supreme Court said at common law, a plaintiff who came to the nuisance would not be barred from pursuing it. Again, not a full, complete defense. But the fact that the land was acquired or improved after the nuisance-generating activity began would be a factor in determining if the nuisance was actionable. We were absolutely within our rights to mention that. It was one statement in the jury at the end, and it was not objected to at closing. So what you related was dictable, was it not? Yes, Your Honor. But it also cited that the Illinois Supreme Court did cite the restatement favorably. The restatement states what it is, and we believe that would be an accurate statement of Illinois law. Thank you. Your time is up. Thank you. Ms. Hamilton, you may proceed. Thank you. May it please the Court. A couple of things to note. There were objections found in the closing argument, and those were raised in the post-trial briefs. But does it relate to this statement? It did. It related to the this case is not the lottery statement. It also related to the this is trifling, temporary, simply because the plaintiff's trial counsel wanted to preserve that issue of determining as a matter of law that it was a. . . Okay. But they came to this location. They knew what they were getting into. It was not objected to? I don't recall if that was objected to immediately following the closing argument. I know that it was the subject of multiple briefs prior to the court in the motions of limine and then also in the post-trial briefs. And that's incredibly important because, again, we talked a little bit about whether this is categorized as a temporary or permanent nuisance and how that affects what the jury heard. And it affected not only the evidence in the sense of experts as to damages, but it also affected evidence as to arguments that were made in terms of not just arguments but also evidence in terms of statements made by the defendant's representative, Mr. Lewis, that the jury was not allowed to hear. Emails between him and other residents about, oh, well, sometimes it's cold and then the smell can be worse or better. Sometimes the rain makes it worse or better. And additionally, the jury was not allowed to hear evidence about the additional permits that the defendant's representative had said he was going to be seeking. His statement that he intended to continue operating indefinitely. So that did directly impact the evidence the jury heard. The jury did hear arguments that it was a trifling matter that the court already ruled that it was temporary, that it was akin to having dust from a house being built next to you, which we think is wholly improper. The defendant in this case was seeking permits to expand. We also had evidence that the defendant would have to be venting gases forever, not just until it reached capacity and had a cap put on it, but as we set forth in our brief, Mr. Andrews, when he first built his house, it was in 1994, he was told the landfill had six years left on its permit and it'll be at capacity at that time. That's what he was told in 1994. Well, then there were two more expansions and two more permit applications to the point where now the landfill's right across the street from his house and they've said that they want to expand further. So we believe that there's ample evidence that this should be considered a permanent rather than a temporary nuisance. At a minimum, the jury should have been able to make that determination. As far as counsel's argument about the plaintiffs being able to enjoy their property multiple times, that's not what the Andrews testified specifically. They said they couldn't use their pool, that they had put in all this landscaping they weren't able to enjoy. Kurt Andrews, who is a former sewer worker, sewer and water contractor, testified that the odor was strong enough to make him gag and force him to remain indoors and described it as intolerable. So this wasn't a situation where, oh, sometimes in the summer it's a little rough. This is a sewer contractor saying it's forcing him to remain indoors, it's that bad. Additionally, they weren't able to use their pool because so many birds and squirrels and other varmint were dying and then drowning in the pool or dumping garbage in the pool. So this wasn't a situation of sometimes it's inconvenient. This was I can no longer use my property in the manner I built it back in 1994. Counsel made a comment about why they shouldn't get damages for the rest of their life. That's actually a point of why it should be considered a permanent nuisance. This should be a one-time compensation for this is how my property has been affected, this is my property value has plummeted to this, this is my one-time compensation. They're not asking for a monthly payment for the rest of their lives. They're asking to be compensated for the fact that they bought a home, built a pool and did landscaping and planned a life there thinking that the landfill was going to stay way over there and then it subsequently expanded and ate the tree farm and the apple orchard and now it's across the street. And now what do I do? Because maybe one day possibly it could turn into a golf course and that's certainly something the defendant could argue. But then it would be on them to present evidence as to when that would happen and how that would help the property value as opposed to what the plaintiffs are currently experiencing. Well, would it have been a smelly golf course? I've golfed on golf courses that have previously been landfills. They're not enjoyable in my opinion. In college I had some education in organic chemistry, which I disliked. And I think methane is what is supposedly propagated by landfills. Is there any other? The phrase is fugacious hydrocarbon that is generated. Do you know? I don't know off the top of my head, but I do know that there is significant evidence in the trial court that the venting of gases would continue indefinitely. Well, if it's methane that's vented, usually it can be burned, which I think means that it would turn into water or water vapor. I'm not positive. And CO2. But you don't know or the evidence wasn't present as to what kind of gases were going to be propagated once it was sealed. We never got into it that far simply because the court had ruled that it was a temporary nuisance as a matter of law. Thank you. Thank you very much, Alice. We have other cases on the call. We will take the case under advisement. There will be a short recess.